# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 4:20-CV-00158 |
| v. | (Chief Judge Brann) |
| JAMES EDWARD KING and CHRISTOPHER LEE BROWN, | |
| Defendants. | |

## MEMORANDUM OPINION

### JANUARY 14, 2022

Defendants James King and Christopher Brown were arrested in October 2019 for their roles in a methamphetamine distribution scheme. The Pennsylvania State Police learned that the Defendants were set to receive a pound of meth through the mail via UPS, so troopers intercepted the package, swapped rock salt for the drugs, and then coordinated the delivery to the Defendants. Following their indictment by a Federal Grand Jury, the Defendants filed a litany of pre-trial motions, challenging virtually every investigative action and decrying the Government's prosecution, and the Court's administration, of their case. The Court finds these protests unpersuasive. For the reasons provided below, the Defendants' motions are denied.

## I.     BACKGROUND

### A.     Seizure of UPS Package

On September 24, 2019, Pennsylvania State Trooper Zach Martin spoke with a confidential informant ("C.I."), who informed him that a package containing a pound of crystal methamphetamine would be arriving at Defendant Brown's residence.[1] The C.I. stated that "the package was going to be delivered in someone's name that didn't live there."[2] According to the C.I., Brown said that when the package arrived, he would contact Defendant King, who would then drive to Brown's home to pick it up.[3]

On October 4, 2019, the C.I. informed the State Police that the package was due to arrive that day via UPS.[4] Trooper Martin's partner, State Trooper Robert Williamson, contacted the UPS distribution center in Norry, Pennsylvania to verify that "a package was en route for [655 Pine Cone Drive]."[5] The UPS employees at the distribution center provided the State Police with the name of the intended recipient of the package (Alexandria Salcedo), and Trooper Martin confirmed with the C.I. that no one by that name resided at 655 Pine Cone Drive.[6] UPS and the

---

[1]    Doc. 59 ¶¶ 8–9.

[2]    Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 182:18–20.

[3]    Doc. 59 ¶ 11**.**

[4]    Doc. 59 ¶ 14; Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 183:10–20, 184:18–22.

[5]    Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 184:23–185:8, 200:21–25.

[6]    *Id*. at 200:8–13 ("Q. Now, what did you do to verify whether the person this packaged was addressed to actually lied at that location? Did you call the trailer park or what did you do? A.

2

State Police then "agreed on a location where [Troopers Martin and Williamson] were going to meet the driver" of the truck transporting the package.[7]

En route to the UPS truck, Trooper Martin contacted the Union County Sheriff's Office and requested a "narcotic canine unit" to "conduct a proper narcotics deployment of the [UPS] truck and its contents."[8] The Sheriff's Office deployed Deputy Sheriff Eric Leaman, a K-9 officer who works with a narcotics detection dog, to the location where Troopers Martin and Williamson were waiting with the UPS truck carrying the suspect package.[9]

When Deputy Leaman arrived, he saw that Troopers Martin and Williamson had arranged five packages on the back bumper of the truck for inspection.[10] Deputy Leaman informed the State Police troopers that he "had some concerns about the conditions" of the inspection site—specifically, he noted that "there was a wind tunnel with nothing at the back of it to stop odor," which, when coupled with the fact that "they had just moved the package," made it highly unlikely that the drug detection dog could make an accurate "indication" on the package.[11] Nevertheless, Deputy Leaman directed the drug detection dog to inspect the

---

I called the informant once I had the name and asked if they knew who that was. And I believe she said I never heard of that name were what her words were.").

[7]   Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 185:14–19.
[8]   Doc. 59 ¶ 21; Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 185:19–25.
[9]   Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dep. Leaman Testimony)) at 125:17–126:21.
[10]  *Id*. at 126:22–127:24.
[11]  *Id*. at 126:22–127:3, 129:6–130:2.

packages.[12] But, as Deputy Leaman expected, the dog "did not alert" while in the UPS truck.[13]

Deputy Leaman and the State troopers discussed how best to secure more favorable inspection conditions, and Trooper Martin ultimately decided to transfer the UPS package to the Milton, Pennsylvania State Police barracks.[14] After receiving approval from his supervisors, the UPS driver voluntarily gave the package to the State Police.[15]

At the Milton barracks, the canine unit performed a second inspection, and this time, the canine unit "alerted on the package."[16]

### B. Search of UPS Package

After the canine unit alerted the State Police to the presence of narcotics in the UPS package, Trooper Martin applied for a warrant to search the package.[17] In the accompanying search warrant affidavit, Trooper Martin noted the following:

> On 10/04/19 [he] was contacted by a Source of Information, who has been positively identified and is available and willing to testify in court, that they received information that a package was going to be delivered via UPS on the current day of 10/04/19 to 655 Pine Cone Dr,

---

[12] Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dep. Leaman Testimony)) at 132:12–16.
[13] Doc. 59 ¶ 22; *see also* Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dep. Leaman Testimony)) at 132:12–18.
[14] Doc. 59 ¶ 22; Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dep. Leaman Testimony)) at 132:19–133:6.
[15] Doc. 97 (June 22, 2021 Evidentiary Hearing Tr. (E. Blom Testimony) at 13:19–22.
[16] Doc. 37 ¶ 43; Doc. 59 ¶ 23, Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dep. Leaman Testimony)) at 135:9–138:8.
[17] Doc. 59 ¶ 23.

> E Mifflinburg, Pa. 17844 in a recipient's name that did
> not reside there and would contain methamphetamine.[18]

Trooper Martin explained that he then "contacted [the] UPS Distribution Center for

the area . . . and was informed that a package was out for delivery for 655 Pine

Cone Dr."[19] According to the affidavit, "[t]his package was tracked down and

observed on the UPS truck"; the package "was addressed to Alexandria

SALCEDO," and it "was then confirmed that an Alexandria SALCEDO did not

reside at the 655 Pine Cone Dr. address, matching the details provided by the

Source of Information."[20] Finally, in this affidavit, Trooper Martin explained that

he "contacted Deputy Sheriff Eric LEHMAN with the Union County Sheriff's

Office who is equipped with a K9 for narcotics detection," and that "Deputy

LEHMAN's K9 Charlie did a positive hit on the package for narcotics."[21]

The affidavit makes no mention of the initial deployment by the canine unit

that did not result in a positive hit.[22]

Later that day, Magisterial District Judge Michael Toomey of

Northumberland County, Pennsylvania issued the search warrant for the UPS

package.[23] The State Police executed the warrant and searched the package. In his

police report, Trooper Martin noted that "[u]pon opening the cardboard box, I

---

[18]  Doc. 37-1, Ex. 4 (Search Warrant Application – Package).
[19]  *Id.*
[20]  *Id.*
[21]  *Id.*
[22]  Doc. 37 ¶ 57.H.
[23]  Doc. 37-1, Ex. 5 (Arrest Warrant Affidavit).

observed blue bubble wrap on top and along the sides of a black lock box that was locked up with a combination."[24] Inside the black lock box, Trooper Martin found a "zip lock bag of a white solid chunky material similar to crystal methamphetamine."[25] According to the police report, "[t]he vacuumed seal bag with the suspected methamphetamine weighed approximately 1.1 pounds."[26] Trooper Martin photographed the contents of the black lock box, including the bag with the suspected methamphetamine, for evidence.[27]

After entering the black lock box and suspected methamphetamine into evidence, Troopers Martin and Williamson contacted the UPS Distribution supervisor.[28] They "arranged to have a controlled delivery of a noncontrolled substance, rock salt, in place of the seized suspected methamphetamine on 10/07/19."[29]

### C.   Traffic Stop and Inventory Search

On October 7, 2019, Trooper Martin met with the UPS employee "who was going to be the driver of the truck delivering the package."[30] Trooper Martin provided the UPS driver with the original UPS packaged addressed to "Alexandria Salcedo" at 655 Pine Cone Dr., albeit with the original contents removed and

---

[24]   Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report) at 2.
[25]   *Id.* (the zip lock bag was stowed inside a vacuum sealed bag and additional blue bubble wrap).
[26]   *Id.*
[27]   *Id.*
[28]   *Id.*
[29]   *Id.*
[30]   *Id.*

replaced with "the noncontrolled substance" (i.e., the rock salt).[31] The State Police set up surveillance at 655 Pine Cone Dr.,[32] and then UPS delivered the package at 2:52 p.m.[33] Approximately three-and-a-half hours later, Trooper Williamson saw a white Chevrolet Camaro pull up to the trailer at 655 Pine Cone Dr.[34] A man exited the driver seat of the Camaro and went into the trailer home.[35] After ten minutes, two men left the trailer and went to the Camaro. One man opened the trunk of the car, and then they got into the car's driver and front passenger seats.[36]

According the police report, "[a]s the reverse lights of the Camaro came on, the [C.I.] contacted [Trooper Martin's] cell phone" and told him that she "observed KING and BROWN open the package to check for a tracker."[37] The C.I. stated that King and Brown "took the non-controlled substance out of the packaging and gave it to them to hold temporarily"; however, King and Brown took the non-controlled substance back.[38] The C.I. "was not certain as to where King or Brown placed it," but she stated that "KING and BROWN were leaving the residence currently to go around the block to see if anybody was going to follow them."[39]

---

[31]  *Id.*
[32]  Doc. 97 (June 22, 2021 Hearing Tr. (Tpr. Williamson Testimony)) at 21:2–22:18.
[33]  Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report) at 2.
[34]  *Id.*
[35]  *Id.*
[36]  *Id.*
[37]  *Id.*
[38]  *Id.*
[39]  *Id.* at 3.

After King and Brown drove away from the trailer park, State Police troopers pulled them over and conducted a "felony traffic stop."[40] During the traffic stop, the State Police identified King as the driver and Brown as the front passenger.[41] Both men were placed in custody and transported to the Milton PSP barracks for interviewing.[42]

State Police Captain Mitchell McMunn conducted an inventory search of the Camaro and found "the cardboard box addressed to 'Alexandria Salcedo' that [Trooper Martin] seized on Friday 10/04/19."[43] Captain McMunn "noticed that the sides of the box had been cut open but the top and bottom were still taped shut."[44] Additionally, Captain McMunn noted that "judging from the weight of the box . . . it appeared to be empty."[45]

### D.    Arrest of the Defendants

That day, Trooper Martin sought a warrant for the arrest of King and Brown. In support of the arrest warrant, Trooper Martin attached an affidavit detailing the probable cause for the arrests.[46]

The arrest warrant affidavit repeats the information in the initial search warrant affidavit and details the events that transpired after the State Police

---

[40]  *Id.*
[41]  *Id.*
[42]  *Id.*
[43]  Doc. 37-1, Ex. 7 (McMunn Follow-Up Report).
[44]  *Id.*
[45]  *Id.*
[46]  *See* Doc. 37-1, Ex. 5 (Arrest Warrant).

obtained the warrant to seize and search the UPS package.[47] Notably, the arrest warrant affidavit, when first drafted, included the following description of the inventory search Captain McMunn performed: "An inventory search of . . . KING's Chevrolet Camaro revealed that the cardboard box that was used for the control delivery was located in the trunk of the vehicle with the noncontrolled substance still in the cardboard box."[48] But this statement was inaccurate, as Captain McMunn did not find the non-controlled substance (i.e., the rock salt) in the UPS box located in the trunk of the Camaro.[49]

According to Trooper Martin, he learned of this inaccuracy "right before [he left] to take Mr. King and Mr. Brown" to court for their arraignment.[50] After he was "told the non-controlled substance was not found in the package," Trooper Martin "reprinted the last page correcting the mistake that [he] made when [he] sent the original."[51]

### E.    Search of King's Car and Trailer Home at 655 Pine Cone Dr.

After the State Police conducted the vehicle stop and apprehended King and Brown, Trooper Martin filed two additional search warrant applications, seeking

---

[47]  *Id.* at 1.
[48]  *Id.* at 2.
[49]  *See id.*
[50]  Doc. 37-1, Ex. 1 (Suppression Hearing Tr. (Trooper Martin Testimony)) at 30:14–25.
[51]  *Id.* at 31:1–23.

the authority to search King's Chevrolet Camaro and Brown's trailer located at 655 Pine Cone Drive.[52]

In support of these search warrant applications, Trooper Martin attached two separate probable cause affidavits. Both affidavits detail the State Police's pre-arrest investigative efforts, including the initial tip from the C.I., the efforts to confirm the C.I.'s information about the impending delivery of the UPS package containing methamphetamine, the controlled delivery of the UPS package, and the traffic stop and detention of King and Brown.[53]

In the search warrant application for the car, there are two discrepancies in the warrant and accompanying affidavit. First, the warrant contains the following description of the premises to be searched:

> The item requesting to be searched is a white in color Chevrolet Camaro bearing Pennsylvania registration LCD4893 with vin #2Q1FT1EW5A9171623 and registered to James Edward KING III that was involved in a traffic stop at Johnston Rd. and Dietrich Rod. West Buffalo Twp., Union Co., Pa.[54]

However, Trooper Martin's affidavit "requests a search warrant be issued to search the contents of the package Alexandria SALCEDO of 655 Pine Cone Dr. E

---

[52]  *See* Doc. 59, Ex. 2 (Search Warrant Application – Car); Doc. 59, Ex. 3 (Search Warrant Application – Trailer).

[53]  Doc. 59, Ex. 2 (Search Warrant Application – Car) at 2; Doc. 59, Ex. 3 (Search Warrant Application – Trailer) at 2.

[54]  Doc. 59, Ex. 2.

Mifflinburg Pa."[55] Second, the dates listed next to signatures of the judge who

issued the warrant—Magisterial District Judge John H. Reed of Snyder County,

Pennsylvania—on the warrant and attached probable cause affidavit differ. On the

warrant, Judge Reed dated his signature as of October 7, 2019; the date next to his

signature on the affidavit is October 19, 2019.[56]

No such discrepancies exist in the search warrant application for Brown's

trailer. Both the application and accompanying affidavit "request a search warrant

be issued to search the . . . white single wide mobile home with the numbers 655 in

the front window in blue and located at 655 Pine Cone Dr. E West Buffalo Twp.,

Union Co., Pa."[57] Similarly, Judge Reed's signatures on the warrant and

accompanying affidavit are both dated October 7, 2019.[58]

F.   **Search of King's Phone Records**

On October 18, 2019—eleven days after the controlled delivery and

arrests—Trooper Martin sent a formal request to AT&T Wireless asking for the

following:

> the preservation of . . . [a]ll electronic records, subscriber
> information, cell records, voice content, text detail, text
> content, MMS messages, and all stored images and
> messages both sent and received for the subscriber
> associated with the AT&T Wireless telephone number

---

[55] *Id.* (Search Warrant Application – Car). This is the same language contained in the probable cause affidavit attached to the prior search warrant application concerning the UPS package.

[56] *Id.*

[57] Doc. 59, Ex. 3 (Search Warrant Application – Trailer) at 1–2.

[58] *Id.*

> (570) 293-4683 between the dates of 10/04/19 and
> 10/07/19.[59]

AT&T acknowledged receipt of this request on October 25, 2019.[60]

On November 7, 2019, the Union County District Attorney, D. Peter Johnson, filed with the Court of Common Pleas of Union County, Pennsylvania an Application for Disclosure of Records Concerning Electronic Communication Service.[61] Specifically, District Attorney Johnson requested a court order "directing AT&T Wireless to disclose and furnish to the Union County District Attorney's Office" the requested information concerning "AT&T Wireless telephone number (570) 293-4683 between the dates of 10/04/19 and 10/07/19.[62] In support of this application, District Attorney Johnson attached a probable cause affidavit prepared by Trooper Martin.[63] Trooper Martin's phone records affidavit details the controlled delivery to and arrest of King and Brown as well as the investigative steps that preceded these events.[64] The description of the investigation, delivery, and arrests are consistent with those contained in Trooper Martin's prior probable cause affidavits.[65] Relevant here, Trooper Martin's phone records affidavit also includes the following additional information:

---

[59]  Doc. 59, Ex. 4 (Phone Records Application) at 2.

[60]  *Id*. at 1.

[61]  *Id*. at 5–8.

[62]  *Id*.

[63]  *Id*. at 9–13.

[64]  *Id*.

[65]  *Compare id.* at 9–13, *with* Doc. 37-1, Ex. 4 (Search Warrant Affidavit – UPS Package); Doc. 37-1, Ex. 5 (Arrest Warrant Affidavit); Doc. 37-1, Ex. 8 (Search Warrant Affidavit – Car); Doc. 37-1, Ex. 9 (Search Warrant Affidavit – Trailer).

(1) "At 1505 hours I was contacted by CI relating that BROWN had contacted KING via cell phone to inform him of the package delivery. CI related that a phone number they had for KING was (570) 293-4683"; and

(2) "Tpr. Daniel DENUCCI of the Fugitive Task Force was able to determine that the phone number of (570) 293-4683 was an AT&T Wireless phone number registered to James KING utilizing a reverse phone number database."[66]

Later that day, Union County Court of Common Pleas Judge Michael T. Hudock granted the District Attorney's application, ordering AT&T to provide the Commonwealth with the requested information relating to telephone number (570) 293-4683.[67] The Government represents that "the order was submitted to AT&T for processing" on November 8, 2019, and ten days later, "[o]n November 18, 2019, . . . Defendant King's phone records from October 4, 2019 through October 7, 2019 were provided to Trooper Martin."[68] King's phone records "indicated that "[o]n October 4, 2019, Defendant King's phone made 2 voice calls to Co-Defendant Brown's phone at 1045 hours and at 1905 hours," and that "on October 7, 2019, Defendant King's phone made 2 voice calls to Co-Defendant Brown's phone at 1753 hours and 1818 hours, just shortly before his arrival [at] Co-Defendant Brown's residence."[69]

---

[66] Doc. 59., Ex. 4 (King Phone Records Application) at 12–13.
[67] *Id*. at 3–4.
[68] Doc. 59 ¶ 89.
[69] *Id*.

13

The following summer, in June 2020, the State Police applied for a warrant to search

> [a]ll electronic records, subscriber information, call records, voice content, text detail, text content, MMS messages, and all stored images and messages both sent and received for the Black TCL Smartphone located at PSP Milton 50 Lawton Ln., Milton Boro., Northumberland Co., Pa. that was seized from the bedroom Christopher BROWN was occupying at the residence located at 655 Pine Cone Dr. West Buffalo Twp., Union Co., Pa.[70]

In support of this search warrant application, the State Police attached a probable cause affidavit prepared by Trooper Martin.[71] As was the case for the probable cause affidavit for King's phone records, the details contained in Trooper Martin's search warrant affidavit for Brown's phone records are consistent with those in the other affidavits he prepared.[72] According to the Government, this search warrant "ultimately was unable to be executed."[73]

## G.    Procedural Posture

Following their arrest, King and Brown were charged in the Court of Common Pleas of Union County with criminal conspiracy and criminal attempt to distribute a pound of methamphetamine on October 7, 2019.[74] The Court of Common Pleas held preliminary hearings on November 12, 2019 and January 14,

---

[70]   Doc. 59, Ex. 5 (Brown Phone Records Search Warrant) at 1.
[71]   *Id.* at 2–5.
[72]   *Id.*
[73]   Doc. 59 ¶ 90.
[74]   Doc. 37 ¶¶ 1–2; Doc. 59 ¶¶ 1–2, 6.

2020.[75] King then filed an omnibus pre-trial motion, which the Commonwealth opposed.[76] The Court of Common Pleas held an evidentiary hearing but did not enter a decision on the motion.[77]

The Court of Common Pleas scheduled jury selection for July 20, 2020.[78] But prior to jury selection, on July 1, 2020, a Federal Grand Jury in the Middle District of Pennsylvania returned a two-count indictment against the Defendants: (1) Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. § 846; and (2) Attempt to Possess With Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 846.[79]

On September 25, 2020, Defendant King filed with this Court an "Omnibus Pre-Trial Motion" consisting of more than eight separate motions to suppress; multiple motions to dismiss based on alleged improper tampering with and withholding of *Brady* material, the supposed deprivation of a fair and speedy trial, and malicious prosecution; motions to challenge the credibility of certain Government witnesses; and a request for a *James* hearing.[80] In the months that followed, King filed additional motions, many of which restated motions included in the Omnibus Pre-Trial Motion. Of note, King filed motions to compel the

---

[75]   Doc. 37 ¶¶ 3–4; Doc. 59 ¶¶ 3–4.
[76]   Doc. 37 ¶ 5; Doc. 59 ¶ 6.
[77]   *Id.*
[78]   Doc. 37 ¶ 6.
[79]   Doc. 1.
[80]   Doc. 36; Doc. 37.

Government to "provide evidence it is intentionally withholding,"[81] dismiss the case for violations of the Speedy Trial Act,[82] and compel discovery and the production of *Brady* material.[83]

On December 28, 2020, Defendant Brown filed his first motion to suppress.[84] The Government filed its opposition (styled as an answer) to the Defendants' various motions on January 28, 2021.[85] After receiving King's reply brief in support of his motions on February 26, 2021, the Court scheduled a status conference for April 14, 2021.[86]

Following the status conference, the Court issued an order that, *inter alia*, denied King's motion to dismiss for violations of the Speedy Trial Act and denied as moot King's motions to compel the Government to "provide evidence it is intentionally withholding" and produce discovery and *Brady* material.[87] Additionally, the Court scheduled an evidentiary hearing for June 21 and 22, 2021 to aid the Court in resolving the Defendants' outstanding motions.[88]

Prior to the evidentiary hearing, on May 17, 2021, King filed another motion to dismiss that more or less repeated arguments raised in his Omnibus Pre-Trial

---

[81]   Doc. 51.
[82]   Doc. 54.
[83]   Doc. 55.
[84]   Doc. 56; Doc. 57.
[85]   Doc. 59.
[86]   Doc. 73.
[87]   Doc. 77.
[88]   Doc. 78.

Motion.[89] Specifically, King asked the Court to dismiss the case based on the alleged tampering with, or destruction of, certain evidence.[90] King argued that "[t]he prosecution's repeated 'loss' of evidence in this case" amounted to a denial of his Sixth Amendment Right to a Speedy Trial and a violation of the Government's disclosure obligations under *Brady v. Maryland*.[91]

The Court held the two-day evidentiary hearing on June 21 and 22, 2021.[92] Following the evidentiary hearing, the Government filed its post-hearing supplemental brief in opposition to Defendants' motions,[93] and the Defendants filed their corresponding post-hearing supplemental briefs in support.[94]

Defendant King's many (often redundant) filings have muddled the record, creating an unhelpful degree of confusion and inhibiting the Court from providing him with the trial he urgently seeks. That said, as the Court sees it, the defense motions now ripe for disposition include the motions to suppress evidence obtained from the

        (a) seizure of the UPS package;

        (b) search of the UPS package;

        (c) traffic stop and inventory search;

---

[89]  Doc. 81.
[90]  *Id*. at 1–5.
[91]  *Id*. at 5 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).
[92]  Doc. 96; Doc. 97.
[93]  Doc. 98.
[94]  Doc. 99 (King Post-Hearing Supplemental Brief); Doc. 100 (Brown Post-Hearing Supplemental Brief).

(d) arrest of the Defendants;

(e) searches of King's car and the trailer home at 655 Pine Cone Drive; and

(f) search of King's cell phone records.[95]

In addition, the following non-suppression motions are also ripe: (1) a motion to dismiss for allegedly destroying, or otherwise failing to produce, certain evidence;[96] (2) motions to challenge the credibility of certain Government witnesses;[97] (3) a request for a *James* hearing;[98] and (4) a motion to dismiss for malicious prosecution.[99] All other defense motions have either been addressed previously or are subsumed by the motions listed above.

## II.   ANALYSIS

### A.   Seizure of UPS Package

The Defendants first challenge the constitutionality of the State Police's initial warrantless seizure of the UPS package. Specifically, the Defendants assert that Troopers Martin and Williamson violated their Fourth Amendment right to be free of unreasonable searches and seizures when the troopers stopped the UPS truck delivering the package, oversaw the drug detection canine inspection of the package on the truck, and then moved the package to the Milton police station for

---

[95] Doc. 37 ¶¶ 8–140.
[96] *Id*. ¶¶ 141–81; Doc. 81.
[97] Doc. 37 ¶¶ 197–201.
[98] *Id*. ¶¶ 202–10.
[99] *Id*. ¶¶ 217–18.

further inspection. To resolve this issue, the Court must determine (1) whether the

Defendants had a legitimate expectation of privacy regarding the UPS package,

and (2) if yes, whether the State Police had reasonable suspicion to believe the

package contained contraband.

### 1. Reasonable Expectation of Privacy

The Fourth Amendment provides the following:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause, supported
> by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be
> seized.[100]

To raise a Fourth Amendment claim, "a defendant must demonstrate that *his own*

Fourth Amendment rights were violated by the challenged search or seizure."[101] As

such, "the proponent of a motion to suppress bears the burden of proving not only

that the search was illegal, but also that he had a legitimate expectation of privacy

in the [thing] searched."[102]

The Supreme Court of the United States has long recognized that "sealed

packages subject to letter postage" are entitled to Fourth Amendment protection

against unreasonable searches and seizures.[103] Therefore, "the sender and addressee

---

[100] U.S. Const. Amend. IV.
[101] *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (emphasis added).
[102] *Id.* (internal quotation marks omitted).
[103] *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970).

of a piece of mail has a legitimate expectation of privacy even though he or she may not be in physical possession of the mail while it is en route."[104]

This expectation of privacy can apply even where the intended recipient uses a fictitious name.[105] That said, a defendant cannot claim a reasonable expectation of privacy over a package mailed to a third party.[106] Moreover, the expectation of privacy as to a piece of mail held by an addressee—whether named in fact or identified under a fictitious name—does not extend to a separate party to whom the contents of the mail are purportedly "ultimately intended for."[107]

Here, the UPS package was addressed to "Alexandria Salcedo" at 655 Pine Cone Drive E West Buffalo Township, Union County Pennsylvania.[108] The Government maintains that this address is "where co-[D]efendant Brown lives,"[109] and that Defendant Brown was the true intended recipient: "The C.I. related [to Trooper Martin] that [D]efendant Brown stated that he, Brown[,] was to contact [D]efendant King when the package arrived, and that King would travel to Brown's home to pick it up."[110] Indeed, the Government repeatedly asserts that the

---

[104] *United States v. Knuckles*, 2008 WL 794867, at *2 (M.D. Pa. Mar. 24, 2008) (McClure, J.) (citing *United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984); *United States v. Richards*, 638 F.2d 765, 769–70 (5th Cir. 1981)).

[105] *United States v. Pettiway*, 429 F. App'x 132, 135 n.5 (3d Cir. 2011) (citing *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) ("[I]ndividuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names.")).

[106] *Id.*

[107] *Givens*, 733 F.2d at 342.

[108] Doc. 59 ¶ 36.

[109] *Id.*

[110] *Id.* ¶ 11.

20

named addressee ("Alexandria Salcedo") "did not live at that address" and, in fact, "did not exist."[111]

Brown affirmed these facts in his post-hearing supplemental brief, explaining that "this was a package intended for Mr. Brown as a fictitious entity and he had an ownership interest and a reasonable expectation of privacy in its contents."[112] Given Brown's concession that the package was "intended for [him] as a fictitious entity," the Court finds that he has met his burden of establishing that he possessed a reasonable expectation of privacy in the UPS package and therefore has standing to contest the initial detention and search of the package prior to its delivery.[113]

However, Brown's expectation of privacy in the package does not extend to King. As the Government asserts, "King is not the sender, the addressee, a resident, or a possessor of the actual pound of Methamphetamine."[114] King argues that "the very allegations of the government"—namely, "that a package addressed to a fictitious person and sent to Co-Defendant Brown's address was intended for Defendant King"—establishes that "he has standing."[115] But that is not so. As

---

[111]   *Id*. at ¶ 26; *see also* Doc. 98 at 20.
[112]   Doc. 100 at 5.
[113]   *See United States v. Lough*, 2019 WL 1040748, at *26–27 (M.D. Pa. Mar. 5, 2019) (holding that because defendant conceded he was a resident of the search property, he "had a reasonable expectation of privacy" in the residence and thus possessed "standing to challenge the probable cause for the search warrant").
[114]   Doc. 59 ¶ 36.
[115]   Doc. 99 at 2.

explained, the expectation of privacy in a sealed package subject to letter postage resides only with the sender and addressee of the package; the individual a package is "ultimately intended for" does not possess a reasonable expectation of privacy as to the package.[116] As such, King lacks standing to challenge the State Police's initial seizure of the UPS package. His motion to suppress any evidence obtained from the seizure is denied.[117]

### 2. Reasonable Suspicion

Although Brown has the requisite standing to challenge the State Police's initial seizure of the UPS package, his motion to suppress all evidence obtained from seizure as "fruit of the poisonous tree" is nevertheless denied because the State Police had reasonable suspicion to believe the package contained methamphetamine.

In *United States v. Van Leeuwen*, the Supreme Court established that a postal authority may detain a mail parcel for inspection if it has a reasonable suspicion that it contains contraband.[118] Consistent with the Supreme Court's ruling that law enforcement may temporarily detain personal luggage on the basis of reasonable suspicion that the luggage contains contraband,[119] courts have held that the reasonable suspicion standard articulated in *Van Leeuwen* is not limited to

---

[116] *Givens*, 733 F.2d at 342.
[117] *See* Doc. 37 ¶¶ 18–42.
[118] 397 U.S. at 251–52.
[119] *See United States v. Place*, 462 U.S. 696, 700–06 (1983).

seizures by postal authorities—the standard applies equally to mail parcel seizures by other law enforcement officials.[120]

The United States Court of Appeals for the Third Circuit has held that "[i]n determining whether reasonable suspicion existed, the district court must examine the totality of the circumstances confronting the officer at the time and eschew analyzing any one factor in isolation."[121] The Third Circuit emphasizes that "[a]lthough law enforcement officers may not act on a 'mere hunch,' to establish reasonable suspicion, they may 'draw on their own experience and specialized training the make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'"[122]

Here, the Government argues that the information provided by the C.I., which Troopers Martin and Williamson corroborated, established reasonable suspicion to detain the package. The Court agrees. The C.I. informed Trooper Martin that (1) the package was scheduled for delivery to Brown's home; (2) the delivery date was October 4, 2019; (3) the package was sent via UPS; and (4) the listed recipient was a fictional person who did not live at Brown's address.[123] Prior to seizing the package, the State Police corroborated the information provided by

---

[120] *See, e.g.*, *United States v. LeFrance*, 879 F.2d 1, 4 (1st Cir. 1989) (holding that police seizure of FedEx parcel "on reasonable suspicion that it contained contraband . . . was lawful" despite the "absence of probable cause at that point").

[121] *United States v. Colon*, 386 F. App'x 229, 231 (3d Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)).

[122] *Id.*

[123] Doc. 59 ¶ 28.

the C.I.: Troopers Martin and Williamson confirmed that UPS was scheduled to deliver a package to Brown's home on October 4, 2019, and that the listed recipient "did not live at the trailer park and did not exist."[124]

Given the independently corroborated tip from an informant with personal knowledge of the drug delivery[125] and the use of a fictitious name for the listed addressee,[126] Troopers Martin and Williamson reasonably suspected that the UPS package contained narcotics. As such, Brown's motion to suppress all evidence obtained after the initial seizure as "fruit of the poisonous tree" is denied.[127]

## B.    Search of UPS Package

The Defendants next challenge the constitutionality of the State Police's search of the UPS package, arguing that Trooper Martin's "affidavit of probable

---

[124] *Id.*; *see also* Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 184:23–185:8, 200:8–25.

[125] *See United States v. Martinez*, 869 F. Supp. 202, 205 (S.D.N.Y. 1994) (holding that a tip from confidential informant with personal knowledge of drug deal, which law enforcement corroborated by identifying packages matching the informant's description, "provide[d] a basis for the lesser degree of suspicion required to *detain* the packages for further inspection").

[126] *See United States v. Hernandez*, 313 F.3d 1206, 1211 (9th Cir. 2002) ("A fictitious name or address . . . is a highly reliable indicator of the presence of controlled substances.").

[127] Separately, Brown argues that the State Police effectuated the seizure through the UPS truck driver, who was operating as a *de facto* government agent. Doc. 100 at 14–15. Brown contends that the UPS driver's decisions to stop the flow of delivery, allow the canine unit to inspect packages on his truck, and ultimately take the subject package to another location collectively constitute an unconstitutional seizure in violation of Brown's Fourth Amendment rights. *Id.* The Government disputes Brown's characterization of the relationship between the UPS driver and the State Police, asserting that "the turning over of the package by U.P.S. and its agent was consensual." Doc. 98 at 17. This dispute, although intriguing on an intellectual level, has no bearing on the Court's analysis here. Because the State Police troopers had reasonable suspicion that the UPS package contained narcotics, their seizure of the package did not violate Brown's Fourth Amendment rights; whether the State Police effectively engaged the UPS driver as an agent in effectuating the seizure does not alter this analysis.

cause [attached to the search warrant application] was insufficient to justify the search of the package."[128] Specifically, the Defendants assert that the affidavit (1) "omits significant material facts" that went uncorrected, and (2) fails to present "sufficient facts and circumstances . . . to justify the search."[129] The Court disagrees.

### 1.    Alleged Omission of Material Facts

The Defendants argue that Trooper Martin omitted certain "material facts" from his probable cause affidavit that, if considered, would have yielded a different result: "the warrant would not have issued, and the evidence would not have been discovered."[130] Most notably, the Defendants highlight that the affidavit does not "address the informer's motivation for providing [the] information" about the impending methamphetamine delivery,[131] and similarly "[c]ontain[s] no information regarding the initial negative K-9 sniff."[132]

It is well established that "[t]he Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit."[133] In *Franks v. Delaware*, the Supreme

---

[128]  Doc. 57 at 6.

[129]  *Id*. at 6–7.

[130]  Doc. 57 at 8.

[131]  Doc. 59 at 7.

[132]  Doc. 37 ¶ 57.H; *see also* Doc. 59 at 7 ("[T]he dog's failure to alert to the package" and "the time between the failure to alert and the subsequent alert . . . would have been significant factors that the magistrate or any reasonable individual would want to know in determining whether to grant the warrant to inspect the contents of the package.").

[133]  *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012).

Court held that there is "a presumption of validity with respect to the affidavit supporting [a] search warrant"; however, a defendant may be entitled to an evidentiary hearing on whether the affidavit properly considered—that is, either without the material false information or with the material omitted information—establishes probable cause.[134] To rebut the presumption of validity and justify an evidentiary hearing, the defendant must (1) "make a substantial preliminary showing that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit," and (2) "demonstrate that the false statement or omitted facts are necessary to the finding of probable cause."[135]

First, the Court must determine whether the Defendants have shown that Trooper Martin knowingly or recklessly omitted material facts from his probable cause affidavit for the search of the UPS package. The Government acknowledges that the affidavit contains no information on the C.I.'s motivation for cooperating with the State Police or the drug detection dog's failure to alert on the package at the UPS truck. As such, the only question for the Court is whether these omissions constitute a "reckless disregard for the truth."[136]

In *Wilson v. Russo*, the Third Circuit held that "omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known . . . was the kind of thing the judge would wish to

---

[134]  438 U.S. 154, 155–56 (1978).
[135]  *Pabulak*, 700 F.3d at 665 (internal quotation marks omitted).
[136]  *Franks*, 438 U.S. at 155.

know."[137] This "common sense approach" does not require "that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip"; rather, officers must simply provide all information that a reasonable person would consider relevant to the magistrate making the probable cause determination.[138]

Trooper Martin's decision not to include information about "the informer's motivation for providing [the] information"[139] does not constitute a "reckless disregard for the truth."[140] Courts recognize that "this is not the type of omission with which *Franks* or *Wilson* were concerned," particularly where, as here, the affidavit details "independent police corroboration of the information provided."[141] Given that "what matters in the context of a *Franks* hearing is not the informant's truthfulness or untruthfulness, but rather, the affiant's,"[142] information about the C.I.'s motivation for cooperating with the State Police does not qualify as "the kind of thing the judge would wish to know."[143]

Similarly, Trooper Martin's decision to omit from the affidavit any reference to the initial canine inspection of the package in the truck, which did not result in

---

[137] 212 F.3d 781, 788 (3d Cir. 2000) (internal quotation marks omitted).

[138] *Id*. at 787–88.

[139] Doc. 59 at 7.

[140] *Franks*, 438 U.S. at 155.

[141] *United States v. Darby*, 2015 WL 13344905, at *6 (M.D. Pa. Aug. 19, 2015) (Jones, J.).

[142] *Id*. (citing *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993) ("It is well-established that a substantial showing of the *informant's* untruthfulness is not sufficient to warrant a *Franks* hearing.")).

[143] *Wilson*, 212 F.3d at 788.

an alert, does not entitle the Defendants to a *Franks* hearing. Although certainly a closer call, this omission, when considered alongside the disclosure of the subsequent positive alert, does not qualify as "reckless disregard for the truth."[144]

Arguing that this omission justifies a *Franks* hearing, the Defendants direct the Court to the holding by the United States Court of Appeals for the Eighth Circuit in *United States v. Jacobs*.[145] There, a police officer applying for a search warrant "correctly informed the magistrate judge that the [drug detection] dog had shown an interest in the Jacobs package, but neglected to include . . . that no alert had occurred."[146] The Eighth Circuit held that "the fact that the dog failed to alert to the package" would be "clearly critical to the finding of probable cause," and, as such, the defendant established "that relevant information was recklessly omitted from the warrant application."[147]

However, *Jacobs* is distinguishable. First, unlike the canine unit here, the dog in *Jacobs* never alerted to the package.[148] Second, in *Jacobs*, the officer omitted the final inspection performed closest in time to the warrant application;[149] here, the officer did not disclose an earlier sniff test, opting instead to detail only

---

[144] *Franks*, 438 U.S. at 155.
[145] 986 F.2d 1231 (8th Cir. 1993).
[146] *Id*. at 1234.
[147] *Id*. at 1235.
[148] *Id*.
[149] *Id*. at 1234 (noting that the dog "show[ed] an interest" in the package during the first inspection, but the "second canine sniff was negative").

the final inspection, which resulted in a positive alert.[150] As the canine unit here alerted to the package and did so during the final inspection, Trooper Martin's decision to include in his affidavit only the results of the final canine inspection—omitting the initial failure to alert at the truck—was not reckless disregard for the truth.

Second, even were the Court to find that these omissions concern facts "the judge would wish to know,"[151] a *Franks* hearing would nevertheless be unwarranted because the Defendants failed to demonstrate that the inclusion of these omitted facts would alter Magisterial District Judge Toomey's probable cause finding. The Government's corroboration of the C.I.'s information renders the C.I.'s motivation to cooperate legally irrelevant. To establish probable cause for a search warrant based on information provided by an informant, "the government is generally required to show by the totality of the circumstances *either* that the informant has provided reliable information in the past *or* that the information has been corroborated through independent investigation."[152] Here, the affidavit details the ways in which Troopers Martin and Williamson corroborated

---

[150] Doc. 37 ¶ 57.H; *see also* Doc. 59 ¶¶ 22–23; Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dep. Leaman Testimony)) at 132:19–133:6, 135:9–138:8.

[151] *Wilson*, 212 F.3d at 788.

[152] *United States v. Yusuf*, 461 F.3d 374, 384 (3d Cir. 2006) (emphasis added).

the C.I.'s information.[153] As such, the C.I.'s motivation for cooperating is not "necessary to the finding of probable cause."[154]

Likewise, including information about "the initial negative K-9 sniff"[155] would not have affected Judge Toomey's probable cause determination. The Defendants do not cite, and the Court is not aware of, any authority establishing that a prior canine inspection in which the dog did not alert negates a subsequent, positive canine inspection taken closer in time to the issuance of the warrant. Indeed, the Court sees no reason why it would.

The Defendants have failed to establish that Trooper Martin's decision to omit these facts in his probable cause affidavit for the search of the UPS package constitutes a "reckless disregard for the truth"[156] that affected Judge Toomey's probable cause finding.[157] Their request for a *Franks* hearing is therefore denied.

## 2.    Facts Sufficient to Justify the Search

Independent of the identified omissions, the Defendants argue the affidavit as submitted fails to present facts sufficient to justify the search. Specifically, the Defendants assert that based on the information contained in the search warrant affidavit, "[n]o Magistrate could have accurately assessed [the C.I.'s] . . .

---

[153]  Doc. 37-1, Ex. 4 (Search Warrant Application – Package).
[154]  *Pabulak*, 700 F.3d at 665.
[155]  Doc. 37 ¶ 57.H.
[156]  *Franks*, 438 U.S. at 155.
[157]  *Pabulak*, 700 F.3d at 665.

reliability, veracity, or basis of knowledge."[158] Further, the Defendants contend that Trooper Martin "did absolutely nothing to corroborate" the information provided by the C.I.[159] These arguments are without merit.

Pursuant to the Fourth Amendment's prohibition on "unreasonable searches and seizures,"[160] police must generally obtain a warrant supported by probable cause before conducting a search.[161] In making a probable cause determination, the judge issuing the warrant looks at whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[162] Notably, "[a] reviewing court may not conduct a *de novo* review of a probable cause determination."[163] Rather, "[t]he duty of a reviewing court is 'simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'"[164] As such, "if a substantial basis exists to support the magistrate's probable cause finding, [this Court] must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant."[165]

---

[158] 37 ¶ 50; *see also* Doc. 57 at 6 ("Although the affidavit states that Trooper Martin is aware of the name of the informant and that they would be available to testify, there was no indication of the informer's basis of knowledge or their credibility.")

[159] Doc. 37 ¶ 51; *see also* Doc. 57 at 6 ("The affidavit here is lacking . . . any significant corroboration.").

[160] U.S. Const. Amend. IV.

[161] *See, e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

[162] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[163] *United States v. Golson*, 743 F.3d 44, 53 (3d Cir. 2014) (*citing Gates*, 462 U.S. at 236).

[164] *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (*quoting Gates*, 462 U.S. at 238 (ellipsis omitted)).

[165] *Id*. (internal quotation marks omitted).

Here, Trooper Martin's affidavit provides ample information to support Judge Toomey's probable cause determination. In the affidavit, Trooper Martin details his October 4, 2019 conversation with the C.I., wherein she informed Trooper Martin that "a package was going to be delivered via UPS on the current day of 10/04/19 to 655 Pine Cone Dr. E Mifflinburg Pa. 17844 in a recipient's name that did not reside there and would contain methamphetamine."[166] Further, as the Government argues, the affidavit outlines Trooper Martin's independent investigation into the information the C.I. provided:

(1) "[t]he trooper corroborated that a package was scheduled [to be] delivered to 655 Pine Cone Drive E. Mifflinburg PA 17844, just as the C.I. said";

(2) "[t]he trooper corroborated that the package was being delivered by U.P.S., just as the C.I. said";

(3) "[t]he trooper corroborated that the package was being deliver[ed] by U.P.S. *on that day*, just as the C.I. said";

(4) "[t]he trooper corroborated that the addressee did not in fact reside [at] 655 Pine Cone Drive E. Mifflinburg PA 17844, just as the C.I. said"; and

(5) "[t]hrough the use of a narcotic detention canine, the trooper corroborated that the package contained narcotics, just as the C.I. said."[167]

As explained, the absence of information on the C.I.'s "reliability, veracity, or basis of knowledge"[168] does not render Judge Toomey's probable cause

---

[166] Doc. 37-1, Ex. 4 (Search Warrant Application – Package).
[167] Doc. 59 ¶ 45.
[168] Doc. 37 ¶ 50.

determination invalid. To establish probable cause based, in part, on information provided by a C.I., the government need only "show by the totality of the circumstances *either* that the informant has provided reliable information in the past *or* that the information has been corroborated through independent investigation."[169] Because the affidavit details how Troopers Martin and Williamson corroborated the C.I.'s information through independent investigation, the affidavit need not include any information about the C.I.'s reliability, veracity, or basis of knowledge—the corroboration alone gave Judge Toomey what he needed to make an informed decision about whether probable cause existed.

Further, it is well established that an affidavit attesting that a drug detection dog alerted to a package can serve as a valid basis for probable cause, particularly when "other facts in the probable cause assessment were corroborated."[170] Given that the affidavit details the drug detection dog's "positive hit on the package for narcotics," as well as the steps Troopers Martin and Williamson took to corroborate the C.I.'s information, it was entirely proper for Judge Toomey to conclude "there is a fair probability that contraband or evidence of a crime [would] be found" in the UPS package.[171]

---

[169] *Yusuf*, 461 F.3d at 384.
[170] *United States v. Rivera*, 347 F. App'x 833, 837–38 (3d Cir. 2009).
[171] *Gates*, 462 U.S. at 238.

Reviewing the affidavit in its entirety, as is required,[172] the Court cannot conclude that [the Magistrate] erred in finding there was a fair probability that the UPS package contained contraband. As such, the Court finds that the magistrate judge "had a substantial basis for concluding that probable cause existed."[173]

### C.    Traffic Stop and Inventory Search

Next, the Defendants argue that the traffic stop and resultant inventory search are unconstitutional. But these arguments have no basis in fact or law.

### 1.    Traffic Stop

Courts generally recognize that felony traffic stops—that is, traffic stops premised on suspected criminal activity as opposed to traffic violations[174]— constitute "seizures" that implicate the Fourth Amendment.[175] Although seizures typically "must be effectuated with a warrant based on probable cause,"[176] the Supreme Court in *Terry v. Ohio*[177] established an exception to the warrant requirement permitting an officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity was afoot."[178]

---

[172]  *Miknevich*, 638 F.3d at 182.

[173]  *Id*. (citing *Gates*, 462 U.S. at 238).

[174]  Doc. 96 (June 21, 2021 Hearing Tr. (Tpr. Reasner Testimony) at 18:11–19:10.

[175]  *See United States v. Torres*, 534 F.3d 207, 209–10 (3d Cir. 2008) (affirming that for purposes of Fourth Amendment, defendant "was seized when the officers stopped his car" based on suspected criminal activity); *see also United States v. McGrath*, 89 F. Supp. 2d 569, 572 n.2 (E.D. Pa. 2000) (holding that "that a 'felony traffic stop' was the same as a *Terry*-stop").

[176]  *Torres*, 534 F.3d at 210.

[177]  392 U.S. 1 (1968).

[178]  *Torres*, 534 F.3d at 210 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000))**.**

What begins as a valid *Terry* stop can sometimes transform into a *de facto* arrest.[179] In these circumstances, "[l]aw enforcement authorities do not need a warrant to arrest [the] individual"; rather, the arrest is proper so long as "at the moment the arrest was made, the officers had probable cause to make it."[180] The Third Circuit explained this standard as "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."[181] This standard "requires more than mere suspicion; however, it does not require that an officer have evidence sufficient to prove guilt beyond a reasonable doubt."[182]

Here, the Government does not dispute that the felony traffic stop of the Defendants while driving in King's white Chevrolet Camaro transformed into a *de facto* arrest: after confirming King and Brown's identities, the State Police troopers placed both men in custody and transported them to the Milton state police barracks for interviewing.[183] The only question for the Court is whether the troopers had probable cause to make this arrest.

---

[179] *See United States v. Butler*, 93 F. Supp. 3d 392, 398 (W.D. Pa. 2015); *see also United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010) (distinguishing "a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause").

[180] *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002).

[181] *Id.* (citing *Beck v. Ohio*, 379 UY.S. 89, 91 (1964)).

[182] *Id.*

[183] *See* Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report) at 3.

As the Government argues, "[d]ays prior to the events of October 7, 2019, the C.I. provided the correct address, the correct name of the suspects, the correct drug, the correct weight, . . . and the correct vehicle."[184] State Police troopers then lawfully secured the package prior to delivery, confirmed that it contained the suspected methamphetamine, orchestrated a controlled delivery (with rock salt substituted for the meth), verified that UPS delivered the package, observed the arrival of a white Camaro matching the description of King's car provided by the C.I., saw the driver exit the car and enter the trailer at 655 Pine Cone Drive, and watched as two men exited the trailer, went to the car, opened and closed the trunk, and drove off.[185] Trooper Martin then received a call from the C.I., who stated that she was inside the trailer and observed King and Brown open the package before "leaving the residence . . . to go around the block to see if anybody was going to follow them."[186] Based on these "facts and circumstances," it was reasonable for the troopers to "believe[e] that the [Defendants] had committed or [were] committing an offense."[187]

The Defendants dispute this finding, arguing that "there were no reasonable grounds or probable cause for the investigatory stop of Defendants King and Brown after the Camaro left the Pine Cone Drive residence, as police had been

---

[184] Doc. 59 ¶ 138.
[185] Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report) at 2.
[186] *Id*. at 3.
[187] *Burton*, 288 F.3d at 98.

advised that the noncontrolled substance was not in the vehicle prior to the stop."[188] But this argument fails for two reasons.

First, as a factual matter, the evidence does not establish that the C.I. told Trooper Martin that King and Brown did not have the rock salt (i.e., the fake methamphetamine) when they left the trailer home. Trooper Martin's police report provides only that the C.I. "advised that [she] gave the non-controlled substance back and was not certain as to where KING or BROWN placed it."[189] During the June 2021 evidentiary hearing, Brown's counsel tried to get Trooper Martin to admit that the C.I. told him Brown and King did not have the rock salt when they left the trailer home. But despite her best efforts, Trooper Martin didn't budge:

> Q. And did [the C.I.] call to tell you that the substance was not in the box?
>
> A. I don't think she knew.
>
> Q. Okay. Did—so she told you she didn't know?
>
> A. I don't know that we talked specifically. She mentioned that the box was open, and that they were leaving.
>
> . . .
>
> Q. I'm interested in when you learned about the fact that the substance wasn't in the package?

---

[188] Doc. 59 at 9; *see also* Doc. 37 ¶ 137 (citing Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report)) (arguing that Trooper Martin "lacked any reasonable suspicion to initiate a *Terry* stop of [King's] vehicle after [the C.I.] called [Trooper Martin] when [King] exited the premises to inform him that [King] did not have any drugs, real or fake, in his possession").

[189] Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report) at 2–3.

A. I think it was when going to the Judge's office to be
arraigned, because it was my understanding, as I typed on
the arrest charges for Mr. King and Mr. Brown the night
of the 7th, because I though the rock salt was in the box.

. . .

Q. So you knew at the point that she called you, as soon
as these two individuals left, that they did not have the
controlled substance with them?

A. I didn't know if they had it or not. I know she stated
that she gave it back to them and then wasn't sure
where—if they placed it back in the box or if it was
somewhere still in the house.[190]

Second, even if Trooper Martin was aware that King and Brown did not

have the rock salt in their possession at the time of the arrest, that would not negate

probable cause. As the Government notes, King and Brown need not "be in

possession of the actual Methamphetamine or the rock salt to be guilty" of "felony

Attempt to and Conspiracy of Possession with Intent to Deliver under 18 Pa. C.S.

§§ 901(a), 903."[191]

For these reasons, the Defendants' motions to suppress all evidence obtained

pursuant to this traffic stop and *de facto* arrest as "fruit of the poisonous tree"[192] are

denied.

---

[190]  Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 223:2–7, 225:23–
226:3, 227:13–19.
[191]  Doc. 59 ¶ 137.
[192]  Doc. 37 ¶ 134; *see also* Doc. 57 at 9.

## 2.    Inventory Search

Separately, the Defendants' claim that the inventory search of King's car violated their rights under both the United States and Pennsylvania Constitutions.[193] But these arguments are similarly without merit.

The Supreme Court has long held that inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment."[194] The Supreme Court of Pennsylvania likewise notes that inventory searches "are a recognized part of [Pennsylvania] law."[195] Under both federal and Pennsylvania law, "[a]fter taking custody of property, officers may make a warrantless inventory search so long as the search is conducted pursuant to standardized procedures"[196] and not "for the sole purpose of investigation."[197]

As the Government explains, the inventory search Captain McMunn performed—"before transporting the vehicle to the impound lot" and before Trooper Martin submitted the arrest warrant application—is "consistent with the [Pennsylvania State Police] inventory search policy."[198] The Inventory Policy

---

[193] *See* Doc. 37 ¶¶ 139–40; Doc. 57 at 9–10.

[194] *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).

[195] *Commonwealth v. Nace*, 571 A.2d 1389, 1391 (Pa. 1990); *see also Commonwealth v. Simonson*, 148 A.3d 792, 797 (Pa. Super. 2016) ("Exceptions to the warrant requirement include the . . . inventory search exception.").

[196] *United States v. Bansal*, 663 F.3d 634, 664 (3d Cir. 2011).

[197] *United States v. Mundy*, 621 F.3d 283, 288 (3d Cir. 2010); *see also Commonwealth v. Lagenella*, 83 A.3d 94, 103 (Pa. 2013) ("An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation.")**.**

[198] Doc. 59 ¶ 140.

requires State Police troopers to perform an inventory search on all vehicles seized or taken into custody.[199] The Government asserts, and the Defendants do not dispute, that "[t]he purpose of the policy [is to] ensure[] conformance with the Constitutions of the United States and Pennsylvania."[200]

In his motion to suppress, Brown argues "[t]he initial search of the Camaro violated Article I, section 8 of the Pennsylvania Constitution in that the police had neither a warrant [nor] exigent circumstances to search the automobile."[201] But Brown misconstrues the nature of the search. This was not an investigative search performed incident to an arrest; it was an inventory search. Pennsylvania courts recognize the "inventory search exception" and "exigent circumstances exception" as distinct exceptions to the warrant requirement under Article I, Section 8.[202] Because this search falls under the inventory search exception, the alleged absence of exigent circumstances justifying the search is immaterial.

Separately, King argues that the search was an unlawful "ruse to rummage for contraband."[203] But in support of this accusation, he notes only that "not a single officer inventoried anything contained in [his] vehicle."[204] That proves

---

[199]  Doc. 59, Ex. 6 (State Police Inventory Policy) at 4.07.B ("Seized vehicles or other property *shall* be inventoried and processed whenever the property is taken into possession.") (emphasis added).
[200]  Doc. 59 ¶ 140.
[201]  Doc. 57 at 9.
[202]  *See Simonson*, 148 A.3d at 797.
[203]  Doc. 37 ¶ 140.
[204]  *Id.*

nothing. Consistent with both federal and Pennsylvania law, the Inventory Policy explicitly prohibits State Police troopers from conducting inventory searches "for the purpose of gathering incriminating evidence and/or contraband."[205] As such, it is altogether unsurprising that "[n]o items of value [i.e., potential evidence] were located in the vehicle"[206]—that wasn't the purpose of the search.

Captain McMunn's inventory search was constitutionally permissible, and, therefore, the Defendants' motions to suppress evidence obtained from the inventory search are denied.

### D.   Arrest of the Defendants

The Defendants next challenge the constitutionality of their arrest and arraignment, which occurred pursuant to an arrest warrant issued by Magisterial District Judge Reed after the Defendants were taken into custody on October 7, 2019. Specifically, King argues that the State Police did not "have any probable cause to initiate the arrest."[207] In King's estimation, Trooper Martin "falsified every instance of probable cause" included in the arrest warrant affidavit, as the "facts stated within seem to be pulled from his imagination."[208] But, again, King misstates the facts.

---

[205] Doc. 59, Ex. 6 at 4.07.B.1.a. Please note, although State Police troopers may not initiate an inventory search for the purpose of gathering evidence, "any evidence and/or contraband discovered during a custodial/inventory search shall be seized and may be used as probable cause to obtain a warrant to completely search the vehicle." *Id*.

[206] Doc. 37-1, Ex. 7 (McMunn Follow-Up Report).

[207] Doc. 37 ¶ 137.

[208] Doc. 37 ¶ 62.

The Fourth Amendment dictates that arrest warrants, as with search warrants, must be "based 'upon probable cause, supported by Oath or affirmation.'"[209] The Third Circuit explains that arrest warrants receive the same "presumption of validity" that the Supreme Court in *Franks* applied to search warrants.[210] Accordingly, a defendant seeking to rebut this presumption and establish that his arrest was unlawful must make the same showing required to invalidate a search warrant: the defendant must prove "(1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause."[211]

Here, King highlights two paragraphs of the arrest warrant affidavit that purportedly contain false or fabricated information. First, King argues that Trooper Martin's description of King's arrival at 655 Pine Cone Drive—that is, "[o]n 10/07/19 approx. 1830 hours a white Chevrolet Camaro arrived" and "[s]urveillance units on scene observed a white male matching the description of [King] open the trunk of the vehicle and close it and a second white male enter the

---

[209] *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (quoting U.S. Const. Amend. IV).
[210] *Edwards v. Kelly*, 136 F. App'x. 468, 470 (3d Cir. 2005) (citing *Franks*, 438 U.S. at 171; *Wilson*, 212 F.3d at 786).
[211] *Wilson*, 212 F.3d at 786 (internal quotation marks omitted).

passenger side of the vehicle"[212]—was "completely fabricated."[213] According to

King, Trooper Williamson, "who was the surveillance officer on the scene,

testified at the preliminary hearing that he couldn't even tell if anyone exited the

vehicle."[214]

But that's not quite right. During the January 2020 preliminary hearing,

Trooper Williamson gave the following testimony:

> Q. Okay. And when that car parked in front of the trailer,
> did you see anybody exit the vehicle?
>
> A. I don't specifically remember if I saw anyone exit,
> but, again, because of the distance it was hard to
> distinguish who was moving where or—
>
> Q. Well, did you see people outside the vehicle?
>
> A. Yea, yes, I could see people moving around.
>
> Q. Okay. And what did you—and how many people did
> you see outside the vehicle moving around?
>
> A. At least two.
>
> Q. Okay.
>
> A. Right.
>
> Q. And then you say them—you saw the trunk of the
> vehicle being opened?
>
> A. Opened.
>
> Q. More than once you said?

---

[212]   Doc. 37-1, Ex. 5 (Arrest Warrant Affidavit) at 1.

[213]   Doc. 37 ¶ 65.

[214]   *Id.* ¶ 66.

> A. Twice, yep."[215]

He essentially repeated this account when testifying at the June 2021 evidentiary

hearing:

> Q. You're looking down towards the – this mobile home.
> And as you did, the, the Defendant's car, the Camaro
> pulls up and is actually facing your car then, correct?
>
> A. Yes, sir.
>
> Q. You see one individual get out and go towards the
> mobile home?
>
> A. Yes, sir.
>
> . . .
>
> Q. Okay. So he goes in there for a while. And then at
> some point, two white males come out, correct? You just
> don't know their names?
>
> A. I just don't know who they were or what—you know,
> the vehicle that arrived . . . was identical—matched an
> identical description provided by Trooper Martin as to
> what Mr. King would have been driving.
>
> . . .
>
> Q. So when—at some point, then, the two individuals,
> then, were toward the rear of the vehicle. Did you see the
> trunk go up?
>
> A. That's how I was able to—the trunk of the—we all
> know how the trunk of a car operates, and I was able to
> interpret it raise.[216]

---

[215] Doc. 37-1, Ex. 1 (Jan. 14, 2020 Preliminary Hearing Tr. (Williamson Testimony)) at 36:11–
37:2.
[216] Doc. 97 (June 22, 2021 Hearing Tr. (Williamson Testimony)) at 45:2–46:19.

Although Trooper Williamson acknowledged that he could not identify who exited the Camaro after it arrived[217] and did not see King place the UPS package in the trunk of the car,[218] he testified that he observed someone who matched the description of King exit the trailer, walk over and open the trunk of the car, get into the driver's seat, and then drive from the property.[219] That is consistent with the description of events contained in the arrest warrant affidavit[220] and provided by Trooper Martin when testifying at the January 2020 preliminary hearing.[221] Put simply, neither Trooper Williamson's nor Trooper Martin's testimony establishes that this portion of the arrest warrant affidavit contains false information, let alone a falsehood that Trooper Martin made knowingly or recklessly.

Second, King argues that Trooper Martin's description of the inventory search—that is, "[a]n inventory search of . . . KING's Chevrolet Camaro revealed that the carboard box that was used for the control delivery was located in the trunk of the vehicle with the noncontrolled substance still in the cardboard box"[222]— "was an intentional falsehood that amounts to evidence planting."[223] King

---

217  *Id*. at 45:2–14.

218  *Id*. at 36:6–12.

219  *Id*. at 45:2–46:19.

220  *See* Doc. 37-1, Ex. 5 at 1.

221  Doc. 37-1, Ex. 2 (Jan. 14, 2020 Preliminary Hearing Tr. (Martin Testimony)) at 10:24–11:6 (explaining that Trooper Williamson contemporaneously relayed that he saw "a driver come out of the Camaro and . . . go inside the residence," and then after "[a] short period of time," he saw "someone come out of the trailer and then open[] up the trunk of the Camaro and then . . . two people occupy the Camaro, driver and a front-seat passenger, and then put on reverse lights and begin to exit the residence").

222  Doc. 37-1, Ex. 5 at 2.

223  Doc. 37 ¶ 68.

highlights language from Trooper Martin's police report noting that the C.I. "advised that King and Brown took the non-controlled substance out of the packaging and gave it to them to hold temporarily."[224] According to King, because Trooper Martin knew "[b]efore [King's] vehicle was ever stopped" that "there was no non-controlled substances in [King's] truck," his decision to "include[] that falsehood" in the arrest warrant affidavit is tantamount to "planting evidence."[225]

But, here, King cherry picks language from the police report to support a conclusion he otherwise cannot prove. The full section of the report reads as follows:

> The CI advised that [she] observed KING and BROWN open the package to check for a tracker. The CI also advised that KING and BROWN took the non-controlled substance out of the packaging and gave it to [her] to hold temporarily. [The] CI advised that [she] then gave the non-controlled substance back and was not certain as to where KING or BROWN placed it. [The] CI related that KING and BROWN were leaving the residence currently to go around the block to see if anybody was going to follow them.[226]

In his moving brief, King conveniently omits the statement that the C.I. informed Trooper Martin that she gave the rock salt back to the Defendants and was unsure where they put it.[227] Read in full, this account in the police report does not prove

---

224  *Id*. ¶ 69 (citing Doc. 37, Ex. 6 at 2).

225  Doc. 37 ¶ 72.

226  Doc. 37-1, Ex. 6 (Oct. 23, 2019 General Offense Report) at 2–3.

227  *See* Doc. 37 ¶¶ 69–72.

Trooper Martin knew "[b]efore [King's] vehicle was ever stopped" that "there was no non-controlled substances in [King's] truck."[228]

Far from showing that the erroneous factual claim in Trooper Martin's arrest warrant affidavit—that "the control delivery was located in the trunk of the vehicle *with the noncontrolled substance still in the cardboard box*"[229]—constitutes "an intentional falsehood that amounts to evidence planning,"[230] the evidence presented strongly indicates that this was simply an honest mistake. At the June 2021 evidentiary hearing, Trooper Martin testified that when he learned that State Police troopers recovered the UPS package from the trunk of King's car, he "just assumed . . . the rock salt was also with that."[231] When preparing to transport King and Brown to the courthouse for their arraignment, Corporal McMunn "corrected [him] and said the rock salt wasn't in that box."[232] Trooper Martin then revised the arrest warrant affidavit, noting "that the substances were not located [in the box]," and then provided "the corrected copy to [Magisterial District] Judge Reed" as well as to King and Brown.[233]

---

[228] *Id.* ¶ 72. Further, as noted, during the June 2021 evidentiary hearing, Brown's counsel tried to establish that the C.I. told Trooper Martin prior to the initial arrest that the Defendants did not have the rock salt. *See* Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 223:2–7, 225:23–226:3, 227:13–19. She failed to do so. *Id.*

[229] Doc. 37-1, Ex. 5 at 2 (emphasis added).

[230] Doc. 59 ¶ 68.

[231] Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 196:6–7.

[232] *Id.* at 273:13–17.

[233] *Id.* at 273:18–25, 274:14–19.

If Trooper Martin truly falsified an affidavit to help secure an arrest warrant, he presumably would not have remedied the error before Judge Reed issued the warrant. But he did. Against this backdrop, the Court finds that the Defendants have not established that this error in the initial arrest warrant affidavit constitutes a knowing or reckless falsehood.[234] Moreover, because Judge Reed received the corrected affidavit prior to issuing the warrant,[235] the Defendants cannot show that the error was "material, or necessary, to the finding of probable cause."[236]

The Defendants therefore failed to establish that either of the purported falsehoods were made knowingly or recklessly and were material to Judge Reed's probable cause determination. As such, the presumption of validity afforded the search warrant affidavit remains undisturbed. The Defendants' motions to suppress evidence obtained from the arrests are denied.[237]

### E.    Search of King's Car and Trailer Home at 655 Pine Cone Dr.

Following the initial arrests, the State Police obtained warrants to search (1) King's white Chevrolet Camaro, and (2) Brown's trailer home at 655 Pine Cone

---

[234] *Wilson*, 212 F.3d at 786.

[235] Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony)) at 274:14–19.

[236] *Wilson*, 212 F.3d at 787.

[237] Specifically, Brown argues that the statement he made "regarding the shipment of methamphetamine instead of marijuana or mushrooms should be suppressed a result of his unlawful arrest and as fruit of the poisonous tree of the earlier unlawful seizure, stop, and arrest." Doc. 59 at 10. Because the Court rejects the Defendants' constitutional challenges to the seizure of the package, traffic stop, and arrest, the statement does not qualify as the "fruit of the poisonous tree." Brown's request for an order suppressing this statement is denied.

48

Drive.[238] The Defendants move to suppress all evidence obtained from these searches, citing purported deficiencies in the probable cause affidavits attached to the warrant applications.[239] But even if accepted as true, the alleged deficiencies do not render the corresponding searches unconstitutional. The motions to suppress are therefore denied.

### 1.   King's Car

The Defendants argue that the evidence obtained from the search of King's car should be suppressed for two reasons: (1) Trooper Martin's probable cause affidavit attached to the warrant application does not "request[] permission to search the Camaro";[240] and (2) the judge's signature on the affidavit bears a date eighteen days after the search occurred.[241] Neither concern justifies suppression.

First, so long as a search warrant identifies the property to be searched and the accompanying affidavit details facts sufficient to establish probable cause, the search is constitutionally valid. An officer's failure to include a request to search the property at issue in the probable cause affidavit does not alter this conclusion.

In the federal system, Federal Rule of Criminal Procedure 41 governs the issuance of search warrants. It provides that "[a]fter receiving an affidavit or other information, a magistrate judge . . . must issue the warrant if there is probable

---

[238] Doc. 59, Ex. 2 (Search Warrant Application – Car) at 2; Doc. 59, Ex. 3 (Search Warrant Application – Trailer) at 2.

[239] Doc. 37 ¶¶ 77–88; Doc 57 at 8–11; Doc. 99 at 6–9; Doc. 100 at 10–14.

[240] Doc. 100 at 10–11; *see also* Doc. 99 at 7.

[241] Doc. 100 at 12–14.

cause to search for and seize a person or property."[242] The rule requires the *warrant* to "identify the person or property to be searched";[243] it does not include any comparable formalistic requirement for search warrant affidavits. Indeed, the Supreme Court has long held that search warrant affidavits "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion," explaining that "[t]echnical requirements of elaborate specificity . . . have no proper place in this area."[244]

Unlike the federal rules, the Pennsylvania Rules of Criminal Procedure explicitly require search warrant affidavits to "identify specifically the items or property to be searched for and seized."[245] However, in *Commonwealth v. Ruey*, the Pennsylvania Supreme Court explained that technical violations of Rule 206 in a search warrant affidavit do not necessarily require suppression of evidence; a search is constitutionally valid so long as the warrant is supported by probable cause and does not suffer some fundamental defect.[246] This holding accords with

---

[242] Fed. R. Crim. P. 41(d)(1).

[243] Fed. R. Crim. P. 41(e)(2)(A).

[244] *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

[245] Pa. R. Crim. P. 206(2).

[246] 892 A.2d 802, 815 (Pa. 2006) ("The failure of Trooper Bryan to comply fully with the requirements of Pennsylvania Rule of Criminal Procedure 206 in no way negated the fact that the district justice who issued the first warrant had a substantial basis for concluding that probable cause existed to suspect Appellant of having committed the various DUI-related offenses with which he was ultimately charged.").

the Pennsylvania Supreme Court's longstanding adherence to the federal practice
of reading search warrant affidavits "in a commonsense manner."[247]

Here, the search warrant correctly identifies the property to be searched: "a
white in color Chevrolet Camaro bearing Pennsylvania registration LCD4893 with
vin #2G1FT1EW5A9171623 and registered to James Edward KING III."[248] And
the search warrant affidavit contains facts sufficient to establish probable cause to
search the car—specifically, it details the State Police's controlled delivery of the
UPS package, King's subsequent arrival at 655 Pine Cone Drive in the white
Camaro, the activity at the trunk of the car (i.e., "a white male matching the
description of . . . King open[ed] the trunk of the vehicle and then close[d] it before
exiting the residence"), and the traffic stop.[249]

The only issue concerns the final sentence of the affidavit:

> With the information provided, I request a search warrant
> to be issued to search the contents of the package
> Alexandria SALCEDO of 655 Pine Cone Dr. E
> Mifflinburg, Pa., to search for Act 64 violations which
> are referred to on Attachment 'A.'"[250]

As the Government explains, this "extraneous 'request' language . . . was
erroneously lifted right out of the affidavit of probable cause for the package."[251]

---

[247] *Commonwealth v. Sangricco*, 379 A.2d 1342, 1345 (Pa. 1977) (citing *Ventresca*, 380 U.S. at 109).

[248] Doc. 59, Ex. 2 (Search Warrant Application – Car) at 1.

[249] *Id*. at 2.

[250] *Id*.

[251] Doc. 98 at 4; *compare* Doc. 59, Ex. 1 (Search Warrant Application – Package) at 2, *with* Doc. 59, Ex. 2 (Search Warrant Application – Car) at 2.

Although undoubtedly an error, it was a harmless one. Given that the search warrant correctly identifies the property to be searched, there is no indication that Judge Reed misunderstood which property he authorized the State Police to search. Therefore, under both federal and Pennsylvania law, this error does not render invalid an otherwise valid search.

Second, courts recognize, and the parties acknowledge,[252] that "[c]lerical errors in the time or date of issuance of a warrant do not necessarily render a warrant invalid."[253] Notably, this applies for clerical errors made both by officers applying for warrants and by the judges issuing them, and for errors both in warrants and in the accompanying probable cause affidavits.[254]

Here, Judge Reed executed the search warrant for King's car on October 7, 2019 at 9:35 p.m., noting that the warrant must be served no later than October 9, 2019.[255] However, the date listed next to Judge Reed's signature on the

---

[252] *See* Doc. 98 at 5–6 ("Providing an incorrect date in the affidavit of probable cause will not necessarily invalidate a search warrant.") (citing *United States v. Thompson*, 2013 WL 594019, at *4 (M.D. Pa. Feb. 15, 2013) (Connor, J.)); Doc. 100 at 11 ("[I]t is clear that a mere clerical or typographical error is not fatal to a search warrant.") (citing *United States v. McKay*, 2014 WL 5147817 (W.D. Pa. Oct. 14, 2014)).

[253] *United States v. Rodriguez*, 2010 WL 1485704, at *5 (M.D. Pa. Apr. 12, 2010) (Kane, J.) (citing *United States v. Walker*, 534 F.3d 168, 171–72 (2d Cir. 2008) (affirming the validity of a search warrant where the search warrant was accidentally predated one year and where officer mistakenly postdated facts by one day); *United States v. White*, 356 F.3d 865, 869 (8th Cir. 2004) (affirming the validity of a search warrant where date on pre-typed application was mistakenly not updated since its last use)).

[254] *See Rodriguez*, 2010 WL 1486704, at *4–5 (holding that issuing judge erroneously dating warrant two days after search did not render warrant invalid); *Thompson*, 2013 WL 594019, at *4 (finding search warrant valid despite the officer listing in the probable cause affidavit the wrong dates for prior investigative actions).

[255] Doc. 59, Ex. 2 (Search Warrant Application – Car) at 1.

accompanying probable cause affidavit is October 25, 2019.[256] The Defendants assert that "this raises the question of whether, on the face of the warrant, it was signed by the affiant before the magistrate."[257] The Government explains that the date on the affidavit is simply "incorrect"—a "clerical mistake[] by the Magistrate."[258] There is nothing in the record to indicate otherwise. During the June 2021 evidentiary hearing, Trooper Martin testified that he applied for, and Judge Reed approved, the warrant to search King's car on October 7, 2019.[259] Likewise, Trooper Dammer testified that he served the search warrant on October 7, 2019.[260]

Absent any evidence to the contrary, the Court accepts the Government's explanation that the date listed next to Judge Reed's signature on the search warrant affidavit (October 25, 2019) was simply a clerical error. Like the extraneous request language, this error was harmless—it does not render the warrant, or the subsequent search, invalid.

The Defendants' motions to suppress evidence obtained from the search of King's car are denied.

---

[256] *Id*.

[257] Doc. 100 at 13; *see also* Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Def. King Argument)) at 85:6–13 ("I believe it's No. 3, the affidavit for search warrant. The paragraph that starts out, On 10/7/19 at approximately 1830 hours has been changed. And I believe it was changed on the 25th. That's why the Government's exhibit is dated 18 days after the search. I believe they did a search of the vehicle under a warrant and then went and changed that warrant and made it an exhibit.").

[258] Doc. 98 at 5–6.

[259] Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Martin Testimony) 193:18–196:20.

[260] Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Tpr. Dammer Testimony) at 87:17–88:19.

## 2.     Trailer Home at 655 Pine Cone Drive

As with the search of King's car, the Defendants challenge the constitutionality of the search of the trailer home at 655 Pine Cone Drive.[261] But this objection similarly has no merit.

Brown argues that Trooper Martin's probable cause affidavit supporting the search warrant application for the trailer home is constitutionally infirm because it purportedly does not (1) "provide sufficient evidence for the magistrate to conclude that there is contraband within the residence," (2) "refer to the fact that the substance was allegedly removed from the package at the residence," and (3) "even mention Mr. Brown, whose cell phone and indicia of his residence there were taken during the search."[262] But the affidavit for the trailer search exhaustively details the State Police's pre-arrest investigative efforts, including the controlled delivery of the UPS package to 655 Pine Cone Drive, King's subsequent arrival at the trailer home, and the traffic stop the State Police performed immediately after King and Brown left the trailer home.[263] This information is more than sufficient to establish probable cause to search the trailer.

Separately, King argues that because "every single instance of Probable Cause [in the trailer search affidavit] has been falsified, this warrant would surely

---

[261] *See* Doc. 37 ¶¶ 83–88; Doc. 59 at 10–11.
[262] Doc. 59 at 11.
[263] Doc. 59, Ex. 2 (Search Warrant Application – Car) at 2; Doc. 59, Ex. 3 (Search Warrant Application – Trailer) at 2.

have been voided under *Franks*," and therefore, "the [r]ock salt that was allegedly at the house would surely have been suppressed."[264] But this constitutional challenge fails for two reasons. First, the supposedly "falsified" instances of probable cause refer only to Trooper Martin's description of King's arrival at 655 Pine Cone Drive and of the inventory search.[265] Those objections were considered, and rejected, above. Second, the remedy King requests—that is, an order prohibiting the Government from admitting into evidence at trial the rock salt[266]—would have no practical effect. As the Government notes, "[t]he rock salt was not found at the residence."[267] The Court cannot suppress evidence that does not exist.

For these reasons, the Defendants' motions to suppress evidence seized from the State Police's search of the trailer home at 655 Pine Cone Drive are denied.

### F.    Search of King's Phone Records

In their final motions to suppress, the Defendants ask the Court to prevent the Government from introducing into evidence at trial all information and material obtained from the search of King's phone records, arguing that the State Police lacked probable cause to conduct the search.[268] Specifically, King argues that Trooper Martin's phone records affidavit "in its entirety [is] a fantasical [sic] creation by the affiant, [as] every aspect of probable cause has been created by

---

[264] Doc. 37 ¶ 88.
[265] Doc. 37 ¶¶ 83–88.
[266] *Id*. ¶ 88.
[267] Doc. 59 ¶ 88.
[268] Doc. 37 ¶¶ 89–101; Doc. 59 at 11.

[Trooper] Martin that implicates [King] and is rife with material omissions and factual misstatements."[269] That is simply untrue.

As explained, the Supreme Court in *Franks* held there is "a presumption of validity with respect to the affidavit supporting the search warrant."[270] To rebut this presumption, the Defendants must prove by a preponderance of the evidence (1) "that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant"; and (2) "that such statements or omissions are material, or necessary, to the finding of probable cause."[271]

Here, King identifies a multitude of allegedly material omissions from, and factual misstatements in, Trooper Martin's phone records affidavit. Although some have already been addressed,[272] he raises several new objections specific to this affidavit. First, King challenges Trooper Martin's characterization of the C.I. as a confidential informant, arguing that "[t]his woman was not a Pennsylvania State

---

[269] Doc. 37 ¶ 89. The probable cause affidavit King cites, Doc. 37-1, Ex. 10, appears to be different than that identified by the Government, Doc. 59, Ex. 4; however, or purposes of this motion, that difference is immaterial as the text of these affidavits appear to be identical.

[270] 438 U.S. at 171.

[271] *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

[272] For example, King again challenges the accuracy of Trooper Martin's description of King's arrival and conduct at 655 Pine Cone Drive immediately preceding the arrest. Doc. 37 ¶¶ 95–97. As explained, King's objections to Trooper Martin's account of these events are without merit. Similarly, Brown's objection the phone records search concerns only arguments raised, and addressed, above. *See* Doc. 59 at 11 (challenging the search warrant application because the accompanying probable cause affidavit was allegedly "void of information regarding the veracity and reliability of the confidential informant").

Police Confidential Informant."[273] The Government responds that "providing the information described in that paragraph makes the person . . . a cooperating individual," and, as such, "[t]here is nothing false or misleading about this paragraph in comparison to the other warrants and corresponding affidavits."[274]

The Court agrees with the Government. In all the probable cause affidavits associated with this case, the State Police refer to the woman who provided the initial tip as a "confidential informant."[275] This makes sense: this woman was intimately connected with Brown and King, and, unbeknownst to them, she provided Trooper Martin details of their alleged drug trafficking activities. Accordingly, Trooper Martin's description of the C.I. as a confidential informant is not a "false statement" that "create[d] a falsehood in applying for a warrant."[276]

Second, King argues that Trooper Martin mischaracterized the events surrounding the canine unit's narcotics inspection:

> The affiant then blatantly falsified that after calling Deputy Lehman [sic] that Deputy Lehman [sic] was the one who requested that the affiant transport the package to PSP Milton. . . . [D]eputy Lehman [sic] would not have, could not have, requested to leave his jurisdiction and also made it perfectly clear in his report who actually requested who to go to PSP Milton.[277]

---

[273] Doc. 37 ¶ 90.

[274] Doc. 59 ¶ 90.

[275] *See* Doc. 37-1, Ex. 4 (Search Warrant Affidavit – UPS Package); Doc. 37-1, Ex. 5 (Arrest Warrant Affidavit); Doc. 37-1, Ex. 8 (Search Warrant Affidavit – Car); Doc. 37-1, Ex. 9 (Search Warrant Affidavit – Trailer).

[276] *Sherwood*, 113 F.3d at 399.

[277] Doc. 37 ¶ 92.

But King misstates the evidence. At the June 21, 2021 evidentiary hearing, Deputy Leaman testified that he told Trooper Martin the conditions outside at the UPS truck were not suitable for proper drug detection,[278] and that "the best thing to do is just set the package somewhere where it's not being disturbed, and just let it sit there for a period of time."[279] Although Deputy Leaman later testified that he never specifically told Trooper Martin to transport the package to the Milton PSP barracks,[280] that is of no consequence. King's attempt to differentiate Deputy Leaman's testimony (i.e., telling Trooper Martin to "set the package somewhere where it's not being disturbed . . . for a period of time"[281]) and Trooper Martin's phone records affidavit (i.e., "[Deputy Leaman] requested I transport the package to PSP Milton in order for the 59 to test the package for narcotics"[282]) splits the finest of hairs. It does not constitute a "false statement" that "create[d] a falsehood in applying for a warrant."[283]

Third, King contests Trooper Martin's description of an alleged phone call between King and Brown prior to the arrest. The phone records affidavit provides

---

[278] *See* Doc. 96 (June 21, 2021 Evidentiary Hearing Tr. (Dpt. Leaman Testimony)) at 129:21–130:3 ("So I know that my dog indicates on odor. If there's no odor, he's not going to indicate. So being that there was a wind tunnel with nothing at the back of it to stop odor, it's just going out in to the parking lot. And they had just moved the package, I said—I remember making the statement something to the effect of if—if your package is packaged any good way at all, we're not going to get an indication.").

[279] *Id*. at 134:15–19.

[280] *See id.* at 155:15–156:5.

[281] *Id*. at 134:15–19.

[282] Doc. 59, Ex. 4 (King Phone Records Application) at 12.

[283] *Sherwood*, 113 F.3d at 399.

that "[a]t 1505 hours I was contacted by CI relating that BROWN contacted KING via cell phone to inform him of the package delivery. CI related that a phone number they had for KING was (570) 293-4683."[284] King argues that the phone records "clearly show[] this claim was false" because "Brown never, not once, called [King] that day, clearly indicating that the source was uncredible and lying."[285]

That's not right. As the Government explains, the phone records establish that Brown did, in fact, contact King on the day in question:

> The [D]efendant's phone records indicate that on the date of the delivery, there were two calls between King's cell phone and Brown's cell phone, one at approximately 5:53 P.M. when they spoke for a minute and one at 6:18 P.M. which was not answered."[286]

Although the records do not reflect a call between Brown and King prior to 3:05 p.m.—the time the C.I. allegedly contacted Trooper Martin and informed him of the communication between King and Brown[287]—that proves little. As the Government notes, "it is equally likely that Brown either texted King or called from a different phone."[288] The absence of a call record prior to 3:05 p.m. does not, by itself, establish by a preponderance of the evidence that the C.I. lied to Trooper

---

[284] Doc. 59, Ex. 4 (King Phone Records Application) at 12.
[285] Doc. 37 ¶ 94.
[286] Doc. 59 ¶ 94.
[287] *Id*.
[288] *Id*.

Martin or that Trooper Martin knew or should have known at the time he filed the affidavit that the statement was untrue.

Moreover, even were the Court to accept as true King's argument that Trooper Martin's cell records affidavit misstates certain facts, it still would not justify the relief King requests. The alleged misstatements, when considered either individually or collectively, are not "material, or necessary, to the finding of probable cause."[289] Absent the alleged falsehoods,[290] the affidavit still amply supports the warrant.

Like the probable cause affidavits filed in support of the prior search warrant applications, Trooper Martin's cell records affidavit exhaustively details the State Police's pre-arrest investigative actions.[291] Notably, the affidavit describes the C.I.'s initial tip, the State Police's successful efforts to corroborate the information she provided, the controlled delivery to Brown's residence, King's subsequent arrival, and the arrest.[292] Removing the line "I made contact with State Police Confidential Informant" and referring to the C.I. by a separate pseudonym would not alter the probable cause determination.[293] Likewise, the statement that Deputy

---

[289] *Sherwood*, 113 F.3d at 399.

[290] *Id.* at 400 ("When confronted with an affirmative misrepresentation in an affidavit submitted to procure a search warrant, a court must excise the false statement from the affidavit. . . . [The Defendant] then must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit; to wit, the [Defendant] must prove that the false statements were material to the original probable cause finding.").

[291] Doc. 59, Ex. 4 (King Phone Records Application) at 2–5.

[292] *Id.*

[293] *Id.*

Leaman "requested I transport the package to PSP Milton" can be removed from the affidavit without effect.[294]

The statements regarding the 3:05 p.m. call from the C.I. to Trooper Martin undoubtedly bolstered the State Police's assertion that probable cause existed to search King's cell phone records; however, excising these statements from the affidavit does not negate probable cause. The remaining statements in the affidavit—most notably, the C.I.'s tip that after the package containing methamphetamine arrived at Brown's residence, "a friend of BROWN's by the name of Jimmy KING would be picking it up,"[295] and the description of King's arrival, and arrest, at Brown's residence following the controlled delivery[296]— justify Judge Hudock's probable cause finding.

The Defendants therefore fail to rebut the "presumption of validity"[297] afforded Trooper Martin's probable cause affidavit in support of the warrant to search King's cell records. As such, their motions to suppress all evidence obtained from the phone records search are denied.

### G.    Other Motions

Apart from the motions to suppress, King filed a multitude of motions seeking alternative forms of relief. Although the Court addressed some of King's

---

[294] *Id*. at 4.
[295] *Id*.
[296] *Id*. at 5.
[297] *Franks*, 438 U.S. at 171.

motions in prior rulings, four motions remain: (1) a motion to dismiss for allegedly destroying, or otherwise failing to produce, certain evidence; (2) a motion to challenge the credibility of certain Government witnesses; (3) a request for a *James* hearing; and (4) a motion to dismiss for malicious prosecution. For the reasons provided below, these motions are also denied.

### 1.      Motion to Dismiss for Allegedly Destroying, or Otherwise Failing to Produce, Certain Evidence

King moves to dismiss the case because he believes "[a]ll physical evidence has been denied [him] in one way or another."[298] Specifically, King identifies seven categories of evidence the Government allegedly lost, destroyed, or tampered with, which, he argues, constitutes a denial of his Sixth Amendment right to a fair trial and a violation of the Government's obligation under *Brady v. Maryland*[299] to disclose material exculpatory evidence.[300]

First, King argues that the Government intentionally suppressed evidence of the initial canine inspection at the UPS truck as well as footage of the second canine inspection at the Milton police station.[301] But, here, King fails to show that any unproduced evidence relevant to the canine inspections exists. The absence of evidence may be a relevant issue at trial; it is not a valid basis for dismissal.

---

[298]  Doc. 81 at 5; *see also* Doc. 37 ¶¶ 141–81.
[299]  373 U.S. at 83.
[300]  Doc. 81; *see also* Doc. 37 ¶¶ 141–81.
[301]  Doc. 81 at 2–5.

Second, King notes that the Government failed to locate the rock salt that Trooper Martin substituted for the methamphetamine in the UPS package for the controlled delivery.[302] King "believes [the rock salt] was intentionally destroyed,"[303] arguing that "the [C]ourt cannot accept that this rock salt just simply disappeared."[304] But the absence of evidence does not establish intentional destruction. King is entitled to argue this point at trial, but, at this stage, the Government's inability to locate the rock salt does not constitute a constitutional or *Brady* violation necessitating dismissal.

Third, King argues that the Government intentionally destroyed his cell phone.[305] The Government acknowledges that King's "cell phone was never recovered,"[306] and states that it "is without sufficient knowledge [of] what he did with his phone or who recovered it for him."[307] Again, the absence of evidence does not establish that the phone was intentionally destroyed. This is not grounds for dismissal.

Fourth, King asserts that "[o]n November 27, 2019, 50 days after [his] arrest, [he], via his counsel, filed for discovery in which all recordings and video-tapings were requested"; however, the Commonwealth allegedly never produced

---

[302] *Id*. at 3.
[303] Doc. 37 ¶ 172.
[304] Doc. 81 at 3.
[305] Doc. 37 ¶¶ 151–61; Doc. 81 at 3–4.
[306] Doc. 59 ¶ 153.
[307] *Id*. ¶ 159.

any recordings or video footage.[308] The Commonwealth purportedly "claims the [D]efense did not request this evidence within [the required] 60 days," but, according to King, he "did so in 50 days."[309]

The Government responds that it "is without sufficient information to answer what occurred on the State level regarding what discovery was requested and the timing for the same."[310] That won't do. The Federal Government assumed jurisdiction over the case—which was initially filed by State authorities in State court, based on an investigation by the State Police—when it secured an indictment by a Federal Grand Jury in July 2020.[311] The Government cannot disclaim responsibility for, and avoid the consequences of, alleged constitutional and *Brady* violations by claiming ignorance of the State court proceedings.

That said, King has not presented any evidence establishing that his requests were, in fact, timely. In his September 25, 2020 Omnibus Pre-Trial Motion, King asserts that he "filed for discovery" on November 27, 2019.[312] But in his May 17, 2021 motion to dismiss, he claims to possess "numerous copies of letters and tests *to his attorney* to obtain this dash-cam footage."[313] Speaking with your attorney about requesting evidence is not the same thing as requesting evidence.

---

[308]  Doc. 37 ¶¶ 162; Doc. 81 at 4.
[309]  Doc. 37 ¶ 164.
[310]  Doc. 59 ¶ 162.
[311]  *Id*. ¶¶ 2–7.
[312]  Doc. 37 ¶ 162.
[313]  Doc. 81 at 4 (emphasis added).

Given the lack of documentary support establishing that the request was timely, the Court cannot conclude at this juncture that the Government's failure to produce dash-cam footage qualifies as a constitutional or *Brady* violation. If King possesses this documentation, he is certainly entitled to raise this issue in a motion *in limine* prior to trial.

Fifth, King asserts that although he requested recordings from "[t]he interview room the Defendant[s] were placed in"—which, he argues, "should have been preserved"—"[t]he footages are not being provided to [him]."[314] But claiming (without support) that evidence *should* exist does not establish that it *does* exist. This is not grounds for dismissal.

Sixth, King contends that he "requested the data from Brown[']s phone," but "[t]he prosecution claims the data was 'accidentally' destroyed while trying to retrive [sic] it."[315] The Government responds that it "is not in possession of the contents of co-defendant Brown's phone,"[316] explaining that although Brown's "cell phone was collected to be preserved[,] . . . when a search warrant was served, authorities could not get into defendant Brown's cell phone resulting in no evidence from the phone seized."[317] As King presents no reason to question the

---

[314] *Id.*
[315] *Id.* at 5.
[316] Doc. 59 ¶ 214(M).
[317] Doc. 59 at 134.

Government's explanation, the Government's inability to retrieve data from Brown's phone does not qualify as a constitutional or *Brady* violation.

Seventh, King notes that "[t]here is not one single photo of any evidence in this case except the actual drugs."[318] He argues that because "[t]he Field Regulations provide ALL evidence is to be photographed, . . . no one has followed any of the regulations in this case."[319] Even if true, that is not a basis for dismissal, though King may explore this issue at trial, if he so wishes.

The Government's failure to produce these seven categories of evidence, whether analyzed individually or collectively, does not qualify as a constitutional or *Brady* violation necessitating dismissal. As such, the motion is denied.

### 2. Motion to Challenge the Credibility of Government Witnesses

King next moves to "challenge the credibility of" and "impeach" prospective Government witnesses Trooper Martin and Michelle Cunningham.[320] Claiming that they have been "'caught' in multiple material falsehoods," King requests an "impeachment hearing" to cross examine these individuals.[321] But the Government is correct in that "there is no such thing as an 'impeachment hearing.'"[322] King has not provided a sufficient basis for suppressing either Trooper Martin's or Ms.

---

[318] Doc. 81 at 5.
[319] *Id.*
[320] Doc. 37 ¶¶ 197–201.
[321] *Id.*
[322] Doc. 59 ¶ 201.

Cunningham's testimony. To the extent he wishes to impeach them, he may do so at trial.

### 3.      Request for a *James* Hearing

King also asks the Court for a *James* hearing—that is, a "pretrial hearing to determine the existence of a conspiracy and the admissibility of any statements of alleged co-conspirators under Rule 801(d)(2)(E)."[323] Specifically, King argues that the Government must first establish the existence of a conspiracy between King and Brown "before Cunningham can testify against [King] for what an alleged co-conspirator [i.e., Brown] told her."[324]

In the Third Circuit, "*James* hearings are neither required, nor a procedure that is often used."[325] This is for practical purposes: there is a concern that "a pre-trial hearing on the admissibility of coconspirator statements . . . would involve 'a mini-trial.'"[326] As such, in criminal conspiracy cases involving multiple defendants and "large amounts of interrelated testimony," courts routinely "admit the statements provisionally, subject to a later finding of a conspiracy established by the preponderance of independent evidence."[327]

---

[323] *United States v. Savage*, 2012 WL 5866068, at *3 (E.D. Pa. Nov. 20, 2012); *see also United States v. James*, 576 F.2d 1121 (5th Cir. 1978) *modified en banc*, 590 F.2d 575 (5th Cir. 1979).

[324] Doc. 37 ¶ 210.

[325] *Savage*, 2012 WL 5866068, at *3 (citing *United States v. Ammar*, 714 F.2d 238, 245 –47 (3d Cir. 1983) (stating that holding a *James* hearing "is not a mandatory procedure"); *United States v. Solomon*, 2007 WL 927961 (W.D. Pa. Mar. 26, 2007) (noting that *James* hearings are not "custom").

[326] *Ammar*, 714 F.2d at 247.

[327] *United States v. De Peri*, 778 F.2d 963, 981 (3d Cir. 1985); *see also United States v. Continental Group, Inc.*, 603 F.2d 444, 457 (3d Cir. 1979) (upholding admission of co-

Here, King and Brown were both charged in a two-count indictment with conspiracy to distribute and attempt to possess with intent to distribute methamphetamine.[328] As has been established through multiple pre-trial evidentiary hearings, the evidence against both men is largely interrelated—indeed, the case is predicated on a single controlled delivery after which the men were arrested while together in King's car.[329] Given the interrelated testimony and the prior evidentiary hearings, conducting an additional pre-trial evidentiary hearing would serve neither the Court's interest in judicial efficiency nor the broader interests of justice. As King stridently argues, trial in this case has been delayed long enough.[330]

As such, King's request for a *James* hearing is denied. Instead, the Court will follow the practice outlined by the United States District Court for the Eastern District of Pennsylvania in *United States v. Savage*:

> [The Court] will permit the Government to conditionally admit co-conspirators' statements at trial. This offer of evidence will be subject to the Government establishing a proper foundation under Rule 801(d)(2)(E) prior to the close of its case. To the extent the Government does not meet its burden in establishing a conspiracy, [either]

---

conspirator declarations "subject to later connection"); *Ammar*, 714 F.2d at 245–47 (same); *United States v. Gambino*, 926 F.2d 1355, 1360–61 (3d Cir. 1991) (same).

[328] Doc. 1.

[329] *See, e.g.*, Doc. 96 (June 21, 2021 Evidentiary Hearing Tr.); Doc. 97 (June 22, 2021 Evidentiary Hearing Tr.).

[330] *See* Doc. 37 ¶¶ 182–96.

Defendant may move for a mistrial and/or directed verdict at the conclusion of the Government's case.[331]

### 4.      Motion to Dismiss for Malicious Prosecution

Lastly, King moves to dismiss the case for "malicious prosecution," arguing that the Federal Government "swoop[ed] in" and took the case from the Union County District Attorney's Office "with only several days to go to trial."[332] Whether true or not, that is not the basis for a malicious prosecution claim or dismissal of the case. The motion is denied.

## III.   CONCLUSION

Here, the Defendants put the Government through its paces, challenging the constitutionality of nearly every investigative and prosecutorial action in this case through a multitude of pre-trial motions. But, on these motions, Defendants consistently found themselves on the wrong side of the facts or the law—or both. For the reasons detailed above, the Defendants' motions are denied.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[331]  2012 WL 5866068, at *4 (internal citation omitted).
[332]  Doc. 37 ¶ 217.